KEARNEY v. BOARD OF STATE AUDITORS.

HORTON v. SAME.

1. PUBLIC OFFICERS—CONSTITUTIONAL LAW—INCREASE OF SALARY—
   TERM OF OFFICE—STATE TAX COMMISSION.

   Act No. 331, Pub. Acts 1913, requiring the State tax com-
   mission to devote their entire time to the duties of their
   respective offices, and increasing the salary of each com-
   missioner from $2,500 to $3,500 per annum, adds no new
   duties to the official obligations theretofore existing, and,
   even if it did, could not lawfully provide for additional
   compensation in violation of Art. xvi, § 3, of the State
   Constitution.

2. CONSTITUTIONAL LAW—STATE TAX COMMISSION.

   Under the constitutional prohibition against increasing
   salaries of public officers after election or appointment, in-
   terpreted in the light of the Constitution of 1850 and the
   debates in the constitutional convention, which indicate
   the intention to re-enact a clause contained in the former
   Constitution without substantial modification, the salar-
   ies of the State tax commissioners could not be increased
   during the term of office for which they were elected, and
   the provision could not be evaded by their resigning and
   securing a new appointment to the commission during the
   period for which the appointments were originally made.
   The office of tax commissioner has a fixed term of six
   years, to which this constitutional measure was intended
   to be applicable.

Mandamus by Thomas D. Kearney and by George
B. Horton against the Board of State Auditors to com-
pel respondents to audit payrolls of relators in accord-
ance with an act increasing their salaries. Submitted
October 28, 1915. (Calendar Nos. 26,841, 26,842.)
Writs denied December 22, 1915.

*Shields & Silsbee,* for relators.

*Grant Fellows,* Attorney General, and *L. W. Carr* and *Clare Retan,* Assistant Attorneys General, for respondent.

PER CURIAM.  Relators in the above-entitled cases are members of the State tax commission of Michigan by gubernatorial appointment.  The office is appointive, with a full term of six years.  Each first became a member of the commission by appointment for a full term.  Relator Horton was appointed and entered upon the duties of his office January, 1911, and relator Kearney two years later.  Except as hereafter stated, they have been continuously members of said commission ever since.  Their respective terms will expire in January, 1917, and January, 1919.  When each entered upon the duties of his office, his salary, as fixed by statute, was $2,500 per annum.  Other than the dates of their first appointments, the facts and questions of law involved are substantially alike in both cases, which are briefed and submitted together.

In 1913 the legislature passed an act (Act No. 331, Pub. Acts 1913) entitled:

"An act to fix the salary and provide for the expenses of the board of State tax commissioners."

The material part of said act is as follows:

"SECTION 1. Hereafter the members of the board of State tax commissioners shall each receive an annual salary of three thousand five hundred dollars, which shall be paid out of the general fund in the State treasury.  The members of said board shall also receive all expenses actually and necessarily incurred in the performance of official duties, all of which shall be audited and allowed by the board of State auditors and paid from said general fund:  *Provided, however,* that the members of said board shall devote their entire time to the duties of their respective offices."

While it may imply more time than formerly should be devoted to those which exist, this act adds no new duties; and, if it did, extra compensation cannot be provided for additional duties within the scope of and germane to the office without violating a constitutional provision forbidding increase in salary after election or appointment, or during the then term of office. *Moore* v. *Nation*, 80 Kan. 672 (103 Pac. 107, 23 L. R. A. [N. S.] 1115, 18 Am. & Eng. Ann. Cas. 397); *United States* v. *King*, 147 U. S. 676 (13 Sup. Ct. 439); *Evans* v. *City of Trenton*, 24 N. J. Law, 764.

Until April, 1915, relators continued to draw their salaries at the rate of $2,500 per annum. On April 27, 1915, both presented their resignations to the governor, which were accepted upon the day they were presented. On the following day, April 28th, both relators were reappointed to the same respective terms and offices from which they had resigned. Their appointments were thereafter confirmed by the State senate, and commissions were at once issued to them under their reappointments. Relator Kearney again took and filed the constitutional oath of office on April 29 and relator Horton on April 30, 1915. Both thereafter claimed that during the balance of the terms to which they were originally appointed, and reappointed to fill vacancies created by their resignations, they were entitled to the annual salary of $3,500, as provided by said Act No. 331, Pub. Acts 1913. Having asked and received from the attorney general an opinion unfavorable to this claim, the State board of auditors declined to audit and allow relators' salaries at the increased rate, taking the position that they were not entitled to the benefit of such increase until the expiration of the terms for which they were originally appointed, for the reason that section 3, art. 16, of the State Constitution of 1909 prohibits increasing

salaries of public officers after their election or appointment. The board did, however, audit the salaries of relators at the rate of $2,500 per annum, as before. After due demand and refusal, these petitions for mandamus were filed to compel the State board of auditors to audit and allow relators' salaries at the rate of $3,500 per annum after the dates they qualified under reappointment, according to the pay roll of said commission as prepared and presented. Orders to show cause were granted and answers filed properly putting the question involved at issue.

It is conceded that members of the board of State tax commissioners are public officers within the meaning of the Constitution, and, had relators continued in office under their original appointments for the terms they are now filling, the constitutional prohibition would preclude their receiving an increase of salary. It is urged, however, that when they resigned and their resignations were accepted, their tenure ended, and there was an absolute vacancy in the office, which the governor could fill by the appointment of any incumbent he chose; that, when he saw fit to appoint them, and they accepted, they began a new tenure of office as independent of and distinct from their former tenure as though other persons had been appointed, entirely free from the constitutional restriction urged by respondent. The ground for this contention is the less lucid phraseology of the prohibition in our present Constitution than that found in the preceding one, or generally in the legislation and Constitutions of other States restricting changes in salaries of incumbents of office. Section 3, art. 16, of the Constitution of 1909, so far as material, provides:

"Salaries of public officers, except circuit judges, shall not be increased nor shall the salary of any public officer be decreased after election or appointment."

The prohibition in our former Constitution of 1850 (Schedule, § 20) is as follows:

"And it shall not be lawful hereafter for the legislature to increase or diminish the compensation of any officer during the term for which he is elected or appointed."

Restrictive provisions of this nature are very common in the Constitutions, and legislation of the several States and the general attitude of the courts sustaining them as obviously wise and beneficial restraints which may not be evaded by any subterfuge has become text-book law based upon abundant decisions. Mechem on Public Officers, § 858; Throop on Public Officers, § 465; 29 Cyc. pp. 1427, 1428. The prevalent form of such restrictions prohibits change of compensation during the term for which the officer was elected or appointed or, in some cases yet more specific, after election or appointment and during the term for which the incumbent is elected or appointed.

It is pointed out that the restrictive clause in our present Constitution makes no mention of any *term*, and that the omission to adopt familiar phraseology, including the term, which has frequently been construed by various courts, permits the course pursued in this case, and by fair construction indicates an intent to apply the restriction only to an incumbent while he continued in office under a particular election or appointment, regardless of any *term* for which he was elected or appointed; it being said:

"It is therefore very evident that the constitutional convention made a distinct change in the phraseology, and necessarily must have intended to make a distinct change in the provision."

It is evident that the phraseology in the present Constitution is changed from the well-seasoned and often construed wording of our former Constitution, harmonizing with that most commonly found in other

constitutional provisions or legislation upon this subject, and it may be conceded that the change has rendered the provision, unaided by context, less complete and more obscure in substituting "after election or appointment" for "during the term for which he is elected or appointed." While the occasion for this change in wording is not readily apparent, neither is it apparent from the language used, construed in the light of the context and convention debates, that there was any intention to limit the scope of the former inhibition, except as to circuit judges. No one would accept strict construction and the literal meaning of this provision, if it has a meaning standing alone and exactly as it reads. If, as it reads, the salary of any public officer cannot be increased or decreased "after election or appointment," then by it, at the time of their first appointment, the status of relators was fixed in that particular for life, or so long as and whenever they might hold that office.

It is a maxim that the object of construction, as applied to a written Constitution, is to ultimately ascertain and give effect to the intent of the people in adopting it. The language here used calls for implications, being neither sufficiently precise nor complete in itself to make plain the intent without them. Implied constitutional restraints upon the legislative power are sometimes ascertained to be as manifest and effectual as those directly expressed in the language employed. *Rathbone* v. *Wirth,* 150 N. Y. 459 (45 N. E. 15, 34 L. R. A. 408). Resort may therefore be had not only to the indicated object sought to be accomplished and the mischief to be guarded against, which has been too often and abundantly reviewed by courts of last resort to need discussion here, but it is also permissible to examine the proceedings of the convention which framed the Constitution. The convention debates disclose that the member who introduced the

clause made reference to, and manifestly was moved by, the prohibition in the Constitution of 1850, expressing himself as advocating some provision of like kind in the organic law "to prevent that tampering with salaries," referring in subsequent remarks upon the subject to increasing or decreasing salaries of officers during their terms. The only matter relating to this clause discussed at any length was a proposed exception from its provisions in favor of circuit judges, there being a diversity of opinion upon that question which delayed its passage. Otherwise we find no suggestion of opposition to the clause or manifestation of an inclination to modify the restrictions of the former provision which it was to succeed. That such was the understanding of its meaning and intention of those who framed the Constitution is confirmed by their official address to the people of the State upon the subject. The act under which the constitutional convention was convened required that before adjournment it should prepare and adopt an address to the people of the State "explaining the proposed changes in the present Constitution, and the reasons for such changes, and such other matters as to the convention shall seem advisable." A committee "On Submission and Address to the People" prepared and submitted the required address to the convention, which approved and adopted it. Of section 3, art. 16, the address to the people says:

"This revises section 21 of article 4 and section 20 of the Schedule of the present Constitution making no material change, except as indicated by the words in italics."

In the clause under consideration here the only words in italics are "except circuit judges." Convention Debates, vol. 2, p. 1441.

While the Constitution derives its force from the people who ratify it, rather than from the convention

which framed it, it is fairly inferable under such circumstances that this clause was accepted by the electors with the understanding and intent that the inhibition of the former Constitution should be and is retained in substance and with the same meaning, except as to circuit judges.

An attribute of the office to which relators were appointed is a fixed term. The statute creating the office gives appointees a vested right as incumbents for a stated period, and provides that, when appointed and qualified, they "shall hold office six years," and until successors are appointed and qualify. Relators were first appointed for the full term in which they are yet serving, and, after their resignations, were at once reappointed for the "unexpired term" of the period of time included in their earlier appointment. While the word "term" applies to the office, rather than the person holding it, after his election or appointment the right of tenure for the term attaches to him, and in common thought and parlance the office and term together become an attribute of and characterise the incumbent during the time for which he is entitled to the office. To hold that he may acquire added rights by simply withdrawing from and again resuming his incumbency for that term, through whatever agency, is subversive of the spirit, if not the letter, of this constitutional provision and contrary to the fundamental principles of public policy underlying constitutional and statutory restrictions of this character.

In construing constitutional provisions where the meaning may be questioned, the court should have regard to the circumstances leading to their adoption and the purpose sought to be accomplished. With due regard to the generally recognized purpose of such provision, and in view of the circumstances attending its framing and adoption, we think it can fairly be inter-

189 Mich.—43.

preted as indicating an intent on the part of those adopting the new Constitution to make "no material change" in restrictions from the provisions contained in the old, except as to circuit judges; that the intent and purpose sought to be accomplished were the same as the old indicated and provided for, and the clause reasonably may and should be so construed. If so, the incumbent, after his appointment to an office with a fixed term, cannot evade its provisions by resigning and being again appointed for the remainder of such term, thus accomplishing by indirection what cannot be done directly and what it was intended by the prohibition to prevent. *Greene* v. *Freeholders of Hudson County*, 44 N. J. Law, 388.

In support of the contention that our Constitution, as now worded, permits a change of salary whenever a new appointment is made, though the same incumbent is appointed, *Smith* v. *City of Waterbury*, 54 Conn. 174 (7 Atl. 17), is cited, and attention is directed to the constitution of that State (Const. Amend. art. 24), which prohibits extra compensation or increased pay to any public officer "to take effect during the continuance in office of any person whose salary might be increased thereby." In the case cited the salary of a city attorney was involved, and the statute was silent as to his term of office, but the judge by whom he was appointed held his office for two years, and, in making the appointment, fixed the term of the city attorney for two years, at the expiration of which period a new appointment was made. The court adopted the view that the appointee, when so appointed, would hold office for at least the same time as the judge who appointed him, and that "his term of office was practically the same." Thus viewing the nature of his tenure, the court held that a city attorney who, "in fact, under such an appointment, had held his office for two years," and when that term expired was again ap-

pointed for two years, held by virtue of his last appointment, and thereafter was entitled to an increase of salary previously provided. That proposition is not, as we construe the decision, open to dispute or in point here. The court held the incumbent's term was, in fact, under the circumstances shown, for two years, and when reappointed at the end of that time for two years more he entered upon a new term holding "under that appointment, and not under the appointment previously made," the limit of which was past. Were he claiming increased compensation for the unexpired balance of a two-year term, on the strength of having resigned and been immediately reappointed, the case would nearer quadrate with this, and it is possible to infer from the views expressed by that court in *Garvie* v. *Hartford,* 54 Conn. 440 (7 Atl. 723), that under such a state of facts a different result might have been reached.

The constitution of Pennsylvania contains a restrictive clause that "no law shall extend the term of any public officer, or increase or diminish his salary or emoluments after his election or appointment," being identical with the present Michigan provision in the particular upon which relators rely—not in express words prohibiting change during the *term* for which the officer was elected or appointed. In *Guldin* v. *Schuylkill County,* 149 Pa. 210 (24 Atl. 171), an act of the legislature changing the compensation of county coroners was before the court. The coroner's term of office was two years. It was held that the constitutional provision above quoted protected the coroner after his election from reduction of his emoluments by law during the term for which he had been elected. Conversely, by the same construction, the State is entitled to the same protection against increasing his emoluments.

We are well satisfied that by fair implication and

manifest intent of those who framed and adopted the constitutional provision under consideration, it comprehends in application both officer and term, considered together, where the term is fixed by law, and after his election or appointment for a specified term his relation to that term, in the matter of compensation while an incumbent, cannot be evaded by resignation and reappointment.

The writs of mandamus applied for in these cases are therefore denied.